# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CURTIS L. THOMAS,** | ) | |
| | ) | |
| ***Plaintiff,*** | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1691 (FYP) |
| | ) | |
| **PETE BUTTIGIEG, Secretary,** | ) | |
| **U.S. Department of Transportation,** | ) | |
| | ) | |
| ***Defendant.*** | ) | |
| | ) | |

## PLANTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ............................................................................... 1

SUMMARY OF FACTS ..................................................................................... 2

    1.   Plaintiff's Employment ......................................................................... 2

    2.   Ms. Anne Collins and Deputy Administrator Ms. Cathy Gautreaux's April 16, 2018
        Memo……………………………………………………………………..……..3

    3.   Discriminatory Conduct Within the Agency, By Collins and Initial Retaliation
        Commencing in 2013……………………………………………………………4

    4.   Continued Harassment, Discrimination and Retaliation  .................................................7

    5.   Denial of Lateral Hardship Transfers-……………………………………………..12

LEGAL STANDARD OF REVIEW……………………………………………………17

   A.   MOTION FOR SUMMARY JUDGMENT – FRCP 56…………………………………17

ARGUMENT .................................................................................................. 19

   A.   DEFENDANT'S EXHAUSTION ARGUMENTS ARE CONTRARY TO ESTABLISED
       LAW……………………………………………………………………………19

    1.   The Claims Raised by Plaintiff in the Complaint Are Reasonably Related to theClaims
        Presented in His Administrative Charges…………………………………………….........21

   B.   PLAINTIFF HAS ESTABLISHED TRIABLE CLAIMS OF RACIAL
       DISCRIMINATION………………………………………………..…………...……..…24

    1.   Adverse Actions as Required by Title VII…………………………………….....25

    2.   Causation as required by Title VII……………………………………………26

    3.   Adverse Actions Suffered by Plaintiff…………………………………….…...30

   C.   GENUINE ISSUES OF MATERIAL FACT EXIST ........................................................ 31

   D.   PLAINTIFF ENDURED A HOSTILE WORK ENVIRONMENT AS A RESULT OF HIS
       PRIOR EEO ACTIVITY AND RACIAL DISCRIMINATION ............................................. 33

CONCLUSION ................................................................................................ 34

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*American International Group, Inc. v. London American International Corp.*,
  664 F. 2d 348 (2d Cir. 1981) ………………………………………………………..18
*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ……………………..…………………………………18, 19, 30
*Armstrong v. Reno*,
  172 F. Supp. 2d 11 (D.D.C. 2001) ……..……………………………………....……25
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) …………………………………………………….….. 18
*Bayer v. United States Dept. of the Treasury*,
  956 F.2d 330 (D.C. Cir. 1992) ...……………………………………………...19
*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ………………………………………………………… 18
*Briones v. Runyon*,
  101 F. 3d 287 (2d Cir. 1996)………………………………………………… 30
*Brown v. Marsh*,
  777 F.2d 8 (D.C. Cir. 1985). ………………………………………....…….19
*Brown v. Snow*,
  407 F.Supp.2d 61 (D.D.C. 2005) …………………………………………… 26
*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ……………………………………………………….. ..26
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ………………………………………………………. …..18
*EEOC v. Navy Fed. Credit Union*,
  424 F.3d 397 (4th Cir. 2005)…………………………………………………… 18
*Harris v. Forklift Systems, Inc.*,
  510 U.S. 17 (1993)………………………………………………………22, 33
*James v. Booz–Allen & Hamilton, Inc.*,
  368 F.3d 371 (4th Cir. 2004)………………………………………………….26
*Jones v. Bush*,
  160 F.Supp.3d 325 (D.D.C. 2016)…………………………………….…………20
*Klein v. Derwinski*,
  869 F.Supp. 4 (D.D.C. 1994) …………………………………………….….25
*Langley v. Napolitano*,
  677 F. Supp. 2d 261 (D.D.C. 2010)………………………………………….22
*Mackin et al. v. Specter Freight Systems, Inc. et al.*,
  478 F.2d 979 (D.C. Cir. 1973) …………………………………………….….25
*Maryland v. Sodexho, Inc.*,
  474 F.Supp.2d 160 (D.D.C. 2007)………………………………………..20
*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)……………………………………………………… 18

*Mitchell v. Baldrige,*
    759 F.2d 80 (D.C. Cir. 1985) ............................................................................ 26

*Morgan v. Federal Home Loan Mortgage Corp.,*
    172 F. Supp. 2d 98 (D.D.C. 2001) ..................................................................... 22

*Na'Im v. Rice,*
    577 F.Supp.2d 361 (D.D.C. 2008)................................................... 20, 24, 26

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)............................................................................................ 21

*President v. Vance,*
    627 F.2d 353 (D.C. Cir. 1980) ....................................................................…..21

*Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.,*
    595 F.3d 1126 (10th Cir. 2010)....................................................................….26

*Rochon v. Gonzales,*
    438 F.3d 1211 (D.C. Cir. 2006)…………………………………………………26

*Swierkiewicz v. Sorema N.A.*
    534 U.S. 506 (2002).....................................................................................…..26

*Tex. Dep't of Cnty. Affairs v. Burdine,*
    450 U.S. 248 (1981)………………………………………………………...24

*United States v. Diebold, Inc.,*
    369 U.S. 654 (1962) ........................................................................................... 18

*Vance v. Chao,*
    496 F.Supp.2d 182 (D.D.C. 2007) ......................................................……26

*Wash. Post Co. v. U.S. Dep't of Health and Human Servs.,*
    865 F.2d 320 (D.C. Cir. 1989)…..…………………………………………....18

*Weber v. Battista,*
    494 F.3d 179 (D.C. Cir. 2007)…………………………………………………26

*Whorton v. Washington Metropolitan Area Transit Authority,*
    924. F.Supp.2d 334 (D.D.C. 2013)…………………………………………20, 23- 24

## Statutes

    42 U.S.C. § 2000e–3(a)....................................................................................... 25

## Rules

    Fed. R. Civ. P. 56(a)....................................................................................…..18

iv

**SUMMARY OF ARGUMENT**

Plaintiff Curtis Thomas ("Plaintiff" or "Thomas") is an exemplary and accomplished Department of Transportation (hereinafter "DOT," "Agency," or "Defendant") employee, who has devoted more than 37 years of his professional life to public service and enhancing public safety. He rose through the ranks to become the first-ever African-American Senior Executive Service ("SES") employee to be appointed as a Regional Field Administrator ("RFA") for the DOT's Federal Motor Carrier Safety Administration ("FMCSA") – a position he held successfully for more than 7 years.

Unfortunately, after aiding another employee, Mr. Taft Kelly, in his successful pursuit of an EEO claim of racial discrimination against the agency, which finally settled in 2013, Plaintiff found himself the relentless target of discrimination and retaliation, constituting a hostile work environment.

Plaintiff pursued his civil rights by filing a formal EEO complaint No. 2019-28219-FMCSA-02, alleging discrimination on the basis of race and retaliation for his prior EEO protected activity. Due to his participation in the EEO hearing of Kelly, constant advocating for fair treatment, and otherwise opposing unlawful discrimination against himself and his employees, Plaintiff was unreasonably subjected to illegal retaliation. These retaliatory acts included the agency through Plaintiff's direct report, Associate Administrator Ms. Anne Collins, erroneously rejecting his hiring selections (in one instance Collins conducted an entire new interview process just to re-select Plaintiff's hiring choice) effectively removing his authority through constant undermining and belittlement, denying Plaintiff the same resources and opportunities for career advancement as similarly situated white employees, and being the unfair target of Collins' anger, bullying, chastising, and general vitriol, eventually terminating him in his constructive discharge effective January 2019.

Contrary to Defendant's arguments, Plaintiff was subjected to pervasive and severe harassment as a result of his engagement in EEO activity. Plaintiff has demonstrated that there are several genuine disputes regarding material facts and has submitted evidence to support his

1

claims of discrimination and retaliation against Defendant. In addition, Plaintiff has shown that the reasons provided for the Defendant's actions are merely pretextual and do not establish a legitimate, non-discriminatory reason for its adverse actions taken against Plaintiff. Accordingly, as shown herein, Defendant's arguments fail and its request summary judgment must be denied.

### SUMMARY OF FACTS

*1. Plaintiff's Employment*

Plaintiff was a committed and exemplary employee of the Department of Transportation receiving numerous distinctions across his thirty-seven (37) year career. In the Federal Motor Carrier Safety Administration ("FMCSA"), the Administrator is the Selecting Official for Senior Executive Service ("SES") positions, with the Office of Secretary ("OST") and the Secretary of Transportation as the concurring and approving office/official. Thomas Decl. ¶ 5. (Plaintiff's Exhibits are attached to the accompanying Declaration of Curtis L. Thomas.)

FMCSA Administrator Anne Ferro selected and recommended Plaintiff for approval to the Senior Executive Service ranks and position of Regional Field Administrator ("RFA"). Thomas Decl. ¶ 5. Plaintiff was hired for this role in June 2012. His appointment marked the first ever African-American SES employee to be appointed as one of two RFAs for the DOT's Federal Motor Carrier Safety Administration – a position he held successfully for seven years until his constructive discharge. Thomas Decl. ¶ 6.

During his tenure, Thomas directed 14 geographically dispersed division administrators and direct reports; coached, mentored, and trained countless number of staff; and delivered the first ever national best-practices University Safety Research Summit – an endeavor that required forming alliances with more than 23 universities, federal and state law enforcement, and business to find solutions to emerging safety issues within the transportation industry. Thomas Decl. ¶ 7.

Among other accomplishments, Thomas drafted the first ever Motor Coach Passenger's Bill of Rights to promote customer and public service. As the Executive Sponsor of the National

passenger Technical Advisory Group, he achieved a double digit decrease in fatal bus crashes to advance safety measures and compliance by motor carriers. Thomas Decl. ¶ 8.

Thomas's accolades likewise include best-practice training and outreach initiatives for small firms, women-owned, and disadvantaged business enterprises in South Carolina and Virginia. Through his dedication and leadership, Thomas led reductions in fatal crashes across the Eastern Service Center ("ESC"), while simultaneously achieving the best and lowest economic impact costs for doing so nationally. This occurred while large truck and bus crashes were rising nationally. Thomas Decl. ¶ 9.

Of note, from 2012 until 2016, there were only two SES, Regional Field Administrator positions within the FMCSA. The RFA in the ESC was Thomas, an African American male. Pl. The RFA in the Western Service Center was Mr. William ("Bill") Paden, a white male. *See* Thomas Decl. ¶ 10.

   2.  *Ms. Anne Collins and Deputy Administrator Ms. Cathy Gautreaux's April 16, 2018 Memo*

Anne Collins was first hired into FMCSA in 2010 as an Associate Administrator (AA). Bob Miller was her direct report and the Field Administrator for the ESC since 2006. Miller was Kelly's former first-level supervisor until 2008 when he was the Division Administrator for the District of Columbia until Miller had Kelly removed from his DA position. Kelly filed a successful discrimination complaint against Miller in 2006, settled by the agency in 2013. Thomas Decl. ¶ 20. On April 20, 2018, Deputy Administrator Cathy Gautreaux submitted a Memorandum to the Record ("MOR") to the Administrator, Raymond Martinez, titled "Harassment in the Workplace and Conduct Unbecoming a Senior Executive Within FMCSA" ("Gautreaux's Memo"). Pl. Exh. 5. She recounted the culture she encountered: "Upon my arrival to FMCSA (November 2017) I was almost immediately bombarded with allegations of harassing and bullying behavior exhibited by one of our senior executives, Anne Collins. *The passage of time has not diminished these verbal*

3

*complaints*." Pl. Exh. 5 at p. 1 (emphasis added). In Gautreaux's Memo, she details "no less than three individuals," one of whom was Plaintiff, who complained of interactions they had as a result of working with Collins. Pl. Exh. 5 at p. 1. Gautreaux reported what she described as "corroborated, …quantifiable-history as it relates to this individual." Pl. Exh. 5 at p. 1. Her 17-page memo adopted three appendices, including Plaintiff's memo to Gautreaux dated April 16, 2018. Pl. Exh. 5.

Plaintiff's Memo includes a series of observations and complaints intimately detailing the discrimination, retaliation, and hostile work environment that he and his African American employees were subjected to under Collins. Thomas's memo speaks to the heinous attitudes and hostile culture he was forced to endure under Collins.

3. *Discriminatory Conduct Within the Agency, By Collins and Initial Retaliation Commencing in 2013*

Kelly filed an EEO Complaint against Miller and the Agency in 2006. Pl. Exh. 4 at p. 1. As part of the hearing, on or about July 16, 2010, the Assistant United States Attorney requested a deposition from Thomas. Then on or about May 29, 2012, FMCSA Attorney Edward Kendall contacted Thomas and advised him that the AUSA wanted him to testify in Kelly's case against the Agency, on behalf of the Plaintiff. Doing what he believed to be right, after obtaining agency permission, Thomas provided testimony on July 16, 2012. Kelly's matter was subsequently settled in 2013. Unfortunately, the end of Kelly's nightmare, activated the beginning of Plaintiff's.

By providing testimony about the issues of retaliation he saw against Kelly, Plaintiff unwittingly provoked repercussions. Matters worsened when Plaintiff selected Kelly for the vacant position of Field Administrator ("FA") in the ESC. Plaintiff conducted interviews for this position on July 30-31, 2013. After a unanimous panel selection, Plaintiff, as the selecting official, chose Mr. Taft Kelly as the best qualified candidate for promotion.

The GS-15 Field Administrator position in the Eastern Service Center (ESC) was first advertised on May 30, 2013. According to the Agency and Human Resource (HR) then most

current Interview and Selection policy dated November 2, 2012, for supervisory positions at and above the GS-14 grade level (excluding SES), the Director, Office of Human Resources will concur/non-concur on the process and after the selection by the selecting official, make a recommendation to the Deputy Administrator for final approval.[1] Pl. Exh. 8. As the selecting official, Plaintiff understood this decision regarding personnel to be within his discretion.

Collins disagreed. Apparently, despite Kelly being the same individual who successfully filed a suit against Mr. Bob Miller that settled a few months earlier, this was according to Collins, not a consideration in her actions that followed. Still, Collins instituted her own hiring practices. On or about June 11, 2013, Collins suggested that Plaintiff pull back his position posting for the ESC FA position. Pl. Exh. 6. Plaintiff was not inclined to do so as he felt that Kelly was truly the best candidate. After the official and sanctioned interview and unanimous panel selection process where Mr. Taft Kelly was chosen and recommended for the ESC Field Administrator (FA) position, Collins was taken back that Thomas had dared to defy her and proceed with his selection. This is despite Collins having no authority for the reason for her action, *viz.*, wanting to review Plaintiff's decisions. Thus, Collins expressing disproval for the selection of Kelly formed part of a pattern of her undermining Plaintiff's authority at many turns, together forming a mosaic of protracted discriminatory, racist, and bullying tactics.

As part of Collins's interference and persistent attempt to deny Kelly's selection, Collins commented that she had it from a "good source" that Taft was not a good candidate and selection for the FA position. When Plaintiff inquired of Collins's source, she replied that her source was Bob Miller. Thomas Decl. ¶ 21. In light of the clearly biased perspective, Plaintiff

---

[1] The same memo states that "The Associate Administrator for Administration concurs on selections at the GS-14 level within the immediate Office of the Director of Human Resources." Therefore, while Collins had no authority with regard to Plaintiff's selection of Kelly for a GS-15 position, had this been a lower GS-14 position, Plaintiff would have willingly involved Collins, as instructed by the policy.

declined to agree with Collins or Miller. Collins did not appreciate Plaintiff's independent thinking and began clearly attempting to intimidate Plaintiff into changing his selection.

During an In-Service Training for the Service Center, Collins could not hold back her disapproval any longer. During a lunch break she blurted out to Plaintiff, "You walk around with your head up like you're 'uppity,' you should be over there serving your [Division Administrators]". Thomas Decl. ¶ 17. It was at this moment that Plaintiff, born in the Jim Crow South, realized Collins's anger was not only about retaliation. She revealed a racial animus that made the rest of her resistance to Kelly a lot more sensible.

On August 13, 2013, Collins directed Human Resources to delay Plaintiff's already signed selection certificate for Kelly. Pl. Exh. 6. When Human Resources questioned Collins about this decision, despite having no authority – she blamed Plaintiff, challenging his intelligence, and implying he was unable to understand her demand for a second round of interviews. Pl. Exh. 6. At different points in the record, Collins has defended her reason for delay because she told Plaintiff to run any selections by her and he failed to do so, despite him being the Selecting Officer for this position. Collins Decl. ¶¶ 6-7. As part of her demonstrated bias, she then directed Plaintiff to require from Kelly a writing sample[2] and submit to an entirely new second interview process with a new selection panel of her choosing. Thomas Decl. ¶ 19. Still not satisfied at usurping Plaintiff's authority, she continued, adding two white candidates to the second interview panel. Collins selected two candidates who were in the top three candidates on the certificate from Plaintiff's first interview panel. One of the candidate additions (Mr. Bryan Price) received a "NS" for non-select next to his name from the first-panel interview.Pl. Exh. 6. This direct undermining during a hiring process was not done during the FA hiring process for RFA Paden at any point in time.

---

[2] According to Collins, she worked with Kelly before, and apparently did not think he was a strong writer. Similarly, Collins has criticized the quality of education that Historically Black Colleges & Universities ("HBCU") provide compared to majority-serving institutions. Thomas and Kelly are both proud HBCU graduates. Pl. Exh. 4.

Then, as a shock only to Collins, through her interview process, a second panel determined that Kelly was the best candidate.[3] Collins went to Mr. Kennie May, Director of Civil Rights, and asked him whether Kelly could file a grievance against her if she denied or blocked his selection. Pl. Exh. 4. Mr. May gave Collins an emphatic yes. Similarly, on August 13, 2013, HR Director Keith Johnson sent Collins an email advising her that the Agency required an explanation of her "process" in case Kelly's selection was challenged and/or audited by the Office of the Secretary (OST) and Office of Personnel (OPM). Pl. Exh. 6. Collins ignored their warning, but did eventually relent and Plaintiff received official concurrence of Kelly's selection around August 27, 2013.

Shaken, but not deterred, Collins remained focused on Thomas and Kelly. Right after Kelly's appointment approval as the ESC FA, Collins set up a meeting with Kelly and Thomas in her office. Pl. Exh. 4 at 2; Thomas Decl. ¶ 22. During the meeting, she told Taft she wanted him to go meet with Mr. Bob Miller in his office and make amends. Pl. Exh. 4 at 2; Thomas Decl. ¶ 22. She then reiterated how her two black employees, Thomas and Kelly needed to again "serve" their Division Administrators.

Collins has maintained before this Court that she had no knowledge of Thomas's or Kelly's participation in any prior EEO activity involving Bob Miller or the Agency, and therefore was not and could not be acting with retaliatory intent during this time. Even if so, this would not excuse obvious discriminatory behavior. Collins's belief strains credibility in light of present facts such that, whether she knew of Plaintiff's protected activity in Kelly's lawsuit is a genuine dispute of material fact that makes summary judgment inappropriate.

4.  *Continued Harassment, Discrimination and Retaliation*

---

[3] Defendant's waste of government resources of conducting an entirely new interview process, just to re-select the same candidate already offered by Thomas, causes Collins's frequent defense of her harassment as trying to save the agency and taxpayers money, to ring hollow. Rather, they appear more pretextual in light of other actions taken by Collins.

Collins's familiar tricks resurfaced when it came to Mr. Bernard McWay. Pl. Exh. 7. Here, her racial animus and retaliatory tactics followed a similar pattern of disagreeing with Thomas; different illegal efforts to retaliate or put Thomas in his place by undermining his authority and harassing him, per outdated racial hierarchies; Thomas continuing according to Agency procedure; and finally Collins escalating her attacks after such defiance. McWay, an African-American male, in 2016 he attended an off-site agency training course. At this training Federal Programs Specialist Harry Sanders, white male, was also in attendance. Pl. Exh. 4 at 2; Thomas Decl.¶ 38; Pl. Exh. 7 at 2. At this training, participants were directed to pair up and drive to a second location. McWay asked his colleagues for assistance. Pl. Exh. 4 at 2; Thomas Decl. ¶38; Pl. Exh. 7 at 2. He recalled Sanders's vulgar "solution" that "he would chain me to the back of his pick-up truck and drag me down the road." Pl. Exh. 7 at 2; Pl. Exh. 4 at 2.

Thomas and Kelly were accordingly notified of a Workplace Violence allegation between two of their employees, due to Mr. Sanders's comment. Thomas communicated to Collins the grave nature of these comments and assigned Kelly to investigate. Thomas took these allegations very seriously. During the course of the investigation, Sanders admitted to the facts of the incident, including his comment about McWay. Thomas presented Kelly's report recommending a short suspension, providing his support of the recommendation. Collins brushed off the seriousness of this matter and declined to offer any discipline. Thomas Decl. ¶ 39. In her affidavit, she boldly undermined the account of her African American employees, coddling Sanders's comment as "just joking." In completed disregard of the experiences and fears of people of color who were her direct reports, Collins described a white employee's comment to a black employee about dragging him by a chain, as a joke. She had sent a message to her African American employees, and in fact all employees of color. Collins's conduct boldly told those employees that they were not safe in that office, and that if they believed Thomas, as a Senior

Executive would advocate for their dignity or protection, he would just be overruled by Collins. When asked about this incident recently, Collins does not recall such events. That such an occasion could be so easily forgotten speaks volumes.

To further harass and intimidate Thomas and his employees, Collins shortly thereafter promoted Sanders with full support for the GS-14, Supervisory Federal Programs Manager (FPM) in the Atlanta Southern Service Center. McWay, the subject of Sanders's comment, did not fare as well. In fact, by confiding in Thomas and Kelly, he became, in Collins's eyes, affiliated with them. Consequently, soon came the retaliation, including Collins telling McWay, a direct report of Thomas, that he'd never be promoted for what he's done, as long as she is around. Pl. Exh. 7 at 2. Thomas again, could not protect his employees from Collins's retaliatory cudgel.

On August 3, 2018, Thomas selected and offered McWay the promotion of a GS-14 non-supervisory State Programs Manager ("SPM"). McWay interviewed on July 20, 2018, and was the selection panel's unanimous candidate selection. Just as she had with Kelly, Collins interjected herself, feeling it necessary to undermine Plaintiff's decision and authority. More brazen than before, Collins called Thomas on August 3, 2018. She began to harass, bully and attempted to intimidate Thomas into changing his selection. Thomas Decl. ¶¶ 41-42. She demanded he deny and rescind McWay's selection and choose another candidate. To further cut down Thomas, she threatened that she had already gone to Human Resources and Legal, trying to cast fear and anxiety in Plaintiff that he better follow in her footsteps or risk consequences later. Collins did not show an interest in understanding why Thomas had made this selection. She did not care that, again, Thomas had the authority to make this selection, or that the agency had already communication its selection to McWay. *See* Pl. Exh. 8.

During the call, she continued to insult and bully Thomas. "You should have known

9

before you even submitted his name," she scoffed at Plaintiff. Next, Collins proceeded to question Thomas's analysis without asking for his input or seeking to understand. According to Collins, McWay's offer should be rescinded for reasons ranging from obscure to serious but confidential. *But see* Pl. Exh. 7. She claimed that McWay's writing skills were not strong (without describing specifics), she had worked with him and "was not very impressed" (a subjective bar that was not listed as a job requirement for this position), and McWay's "trustworthiness" was in question/ he was under an investigation by the DOT Office of Inspector General. It remains unclear under what authority that Collins acted when she made these comments, accusations, and raised questions about a candidate selection because of her unlawful bias, inaccurate unsupported conjecture and racially motived overtones.

On August 6, 2018, Thomas sent a written response to Collins's August 3rd call. In his communication, he asked several questions about her comments, justification, policy, and accusation/conjectures. In her affidavit, Collins stated that Attorney Redd told her that to deny and rescind the SPM selection, job offer and acceptance over a "current" OIG investigation was not sufficient. Rather, according to Collins, she was advised that better pretext for denying the selection would be an ethics violation from 5 years prior. Finally, Collins claimed she sought advice from Administrator Martinez on the McWay incident and after he assessed the situation, the offer was rescinded.

Of the actors present for any of these events, Collins is the only one who recalls the events such as she laid them out. First, in an August 20, 2019 affidavit, Administrator Martinez denies having any conversation with Collins or reviewing any evidence regarding *her* decision to rescind the promotion, selection and offer to McWay. Second, Ms. Selika Talbott, a direct report under Collins until January 2017, was promoted to a Senior Advisor directly reporting to Administrator Martinez. She was contacted by Collins and recalls a different version of events,

Collins contacted me and stated that McWay was under criminal investigation, and she wanted to have the job offer withdrawn. I relayed this information to Administrator Martinez who advised that he wanted to seek counsel from AA Jack Schreibman. Subsequently Chief Counsel Mullin was brought into the conversation, *but Collins had already spoken to Sabrina Redd in counsel's office*. Counsel's office advised the AA and Administrator that in fact McWay *could* be denied the job offer based upon the investigation that Collins advised of. Ms. Redd issued a legal opinion to support [Collins's] position and thus on the advice of counsel the job offer was rescinded after Collins initiated these actions.

Pl. Exh. 2.

Third, Mr. Bernard McWay offers crucial insight into the investigations spoke of, by

Collins:

Collins statement of my suitability for a position of trust is also another lie she has continued to use to slander my character…The reason surrounding the previous OIG investigation on or about 2013, was no more than mere retaliation for me engaging in previous EEO activity. In fact, Collins has failed to state that 2 OIG investigations were conducted against me during that time. Further, it was done with a previous FMCSA Administrator that was representing the motor carrier I was taking enforcement actions against for operation under an out of service order. The first criminal investigation conducted by the OIG found no grounds of me accepting or receiving any bribe from the motor carrier. However, this was not satisfactory enough for Collins to believe so a year later I was contacted again by 3 Caucasian OIG investigators that continually interrogated me in an attempt to make me admit to something untrue. They continually stated that "they had me on video tape, and I need to admit and sign a statement to avoid prosecution". This happened on several occasion as they requested me to come to their office. It wasn't until I hired legal counsel when they decided to close the investigation as no evidence was ever submitted showing I accepted any bribe. Collins elected to base her own racist decision to suspend me for not admitting to something untrue.

* ** *

Collins has always attempted to defame my character and make false allegations against me anytime I engaged in EEO activity. When I filed my EEO claim in year 2018 against Collins, she in turn imitated another OIG investigation against me for accepting bribes from a motor carrier. This was paradoxical as I've been working within state programs since 2014 that doesn't involve any contact with motor carriers since her last racist actions. Once again, the OIG discovered no findings and the investigation was closed as my case was settled on June 3, 2021 by the agency and I received my rightful promotion.

Pl. Exh.7 at 2.

These three accounts in conjunction reveal a vast departure from truth when viewed alongside any

details offered by Collins. Her testimony is far too diluted with inconsistencies and half-truths for it

to be accepted by any reasonable juror. At minimum, these variances demonstrate genuine disputes of material facts and demonstrate the inappropriateness of summary judgment at this time.

But there is still more to this episode. Missing still is Collins's other retaliatory actions against Thomas for selecting McWay. During the selection process, Collins's humiliated and embarrassed Thomas in front of his senior staff. As she berated him, this time not behind closed doors, she refused to allow Thomas to speak or comment as she hurled allegations at him, deflecting any possible accountability from herself. On August 29, 2018, Collins requested a meeting with Thomas and Kelly following their field leadership meeting. The alleged purpose of the meeting was to inform them of her final decision to deny and rescind the promotion offer made to McWay as the ESC State Programs Manager.  Collins announced such, then followed up that her decision was final. She then directed Thomas to move on to his next candidate and send the selection to her for approval. Again, the SPM position is a GS-14, non-supervisory position. Pl. Exh. 8. The process is concurred/non-concurred on and approved in advance. In other words, Thomas was the selecting officer for this position, and was under no obligation to send such selections to Collins for approval.

Following Collins's tirade Kelly commented that he felt her decision undermined his and Plaintiff's leadership and their ability to lead and direct their direct reports. Plaintiff concurred, but when he attempted to speak, Collins denied him that opportunity and immediately jumped in. Her tone and voice level elevated to an abusive level, her face turned red, and she began yelling at Thomas in front of his direct reports. "This is your fault," she ended, directed at Thomas. Collins has since justified this behavior by predicting that Thomas was "about to discuss a matter" after she directed him not to. While this recitation still does not justify Collins's outburst, to her it did. Further, moving past any uncanny ability to read Thomas's thoughts, Collins's concern lacked foundation. In a meeting of senior staff, that Thomas might ask about an unknown employee investigation of McWay

for which he was never advised of its confidential nature or even its general nature, hardly warrants the outburst from any employee, specifically one of leadership such as Collins.

   5.  *Denial of Lateral Hardship Transfers*

   Another incident that picturesquely describes the environment Thomas was subject to, occurred when he requested a Lateral Hardship Transfer. At the time, on or about April 20, 2015, Thomas's wife was diagnosed with cancer. The brief silver lining he observed was that a new RFA position was created and vacant in the Southern Service Center ("SSC") in Atlanta, Georgia. As Plaintiff's family is from the South, and is still located in South Carolina, this seemed like an ideal opportunity to take care of his wife and mother in the family environment. In his written request to Collins, Plaintiff detailed how the transfer would allow him to be closer to his relatives in need of care, allowing him to function as a primary caretaker. Likewise, as one of the two now senior RFAs it would clearly benefit the Agency to have a new position in the hands of one of their high- achieving employees.

   This was not to be. On May 20, 2015, while in Denver, Collins wrapped up Plaintiff's SES Mid-Year Review. Out of the blue, she advised him verbally of her decision to deny his hardship transfer. Anticipating some unknown rationale or at minimum, closure, Plaintiff inquired of her reason as she began to walk away. Collins simply commented, "You know the reason why", without breaking stride. As a result, Thomas was forced to take leave until he ran out. Then, while Thomas was still not permitted to switch to working remotely, he received limited approval to telework from home in South Carolina 1 week a month.

   When asked about this decision, Collins stated that she did not know of any hardship transfers that had been permitted at the SES level. Def Statement Undisputed Facts ¶ 24. Further, she has proclaimed that she never had the authority to grant this transfer as it remained with DOT. *Id*. ¶ 25. Thomas later learned how the other side lived. A conversation with Ms. Daphne Jefferson, former Deputy Administrator, and Collins's first level supervisor, enlightened Thomas of opportunities that Caucasian colleagues were able to take advantage of. Apparently, Mr. Paden received the full support of

13

Collins for Remote Work from his home in Denver, Colorado, after the death of his dog. Other white employees like Michael Filiaggi, Collins's Transportation Specialist, too received support for "Remote Work" despite his work reporting location being in Washington, D.C. as Plaintiff was not even made aware of such options, whether Collins offered the same opportunities to her white and black employees alike, is another dispute of a material fact that is best left for the fact-finder.

As further evidence to refute Plaintiff's claims of discrimination, Collins points to her role in three other lateral transfers. She cites two instances where she denied a transfer to white employees, and an instance where she touts her approval of the transfer for another black employee. Besides the false logic required to assume that a person discriminating against one person must discriminate equally against all persons of that protected class, this black employee, Mr. Sterlin D. Williams, recalls a very different dynamic between him and Collins. Collins was his second line supervisor from 2010 to 2016. Pl. Exh. 1. In Mr. Williams's statement, he refutes that Collins was in any way involved, besides in an oversight capacity. According to Mr. Williams,

> The Mississippi Division had an opened Division Administrator (DA) position…I was interested in applying for the job because my retirement property was in Southaven, Mississippi, and I was five years from retirement…I had no communication verbally or in writing with Mr. Ruban, my immediate supervisor. Nor did I communicate with Collins, my second line supervisor about a lateral "hardship" transfer. I applied for the position and interviewed for it… There was no reference ever made about a "hardship status.
> 
> ***
> 
> Several other Division Administrators (DA) within the FMSA made lateral transfers to other divisions. To my knowledge, most were considered a lateral transfer and not a lateral "hardship" transfer.

Pl. Exh. 1.

This is one of Defendant's strongest claims refuting that she is not the type of person to commit the conduct Plaintiff has attributed to her. Yet, upon a second look, her house of cards begins to topple. If Collins's rare benevolent moment of allowing a black employee a lateral hardship transfer, did not involve a hardship transfer and did not involve her, Defendant has failed to produce credible evidence of its defense. Collins's propensity to tight walk the line between fact and faction, demonstrates how she cannot be Defendant's sole basis for establishing it was not acting in a discriminatory fashion. In addition,

14

as Defendant is alleging that she did make this transfer of a black employee, and Plaintiff has produced evidence to the contrary, there is a dispute as to the material fact of whether Defendant acted in a discriminatory or retaliatory fashion when Collins denied Plaintiff's lateral hardship transfer, while granting the requests of several white employees. This adds more fuel to the fire that extinguishes summary judgment from being appropriate.

In addition to these aforementioned incidents, Collins has subjected Plaintiff to discrimination and retaliation on more than a handful of occasions, discussed in short order.

- On **March 8, 2013**, Plaintiff had been in his role as RFA for less than a year. At the time, the agency only had 2 RFAs, himself and Mr. Paden. Over his first year in this role, he noticed several core vacant positions that were not filled in the ESC, such as Field Administrator and a noticeable shortage of resources. He emailed, Collins regarding such on March 8, 2013. Collins initially dismissed his requests as rambling and whining. Still when Plaintiff and RFA Paden both submitted requests to fill these positions he noticed Paden would receive approval to fill vacant roles much sooner than he. According to Collins, any discrepancies in approval speed for position vacancies, is purely an administrative matter. Yet, Defendant has not provided evidence of such administrative backlog. This too, is another dispute regarding a material fact that speaks to whether Collins discriminated against Plaintiff by how she chose to respond/ ignore their requests, and additionally, where she allocated resources between RFAs in an equitable fashion.

- On **August 30, 2015**, Plaintiff emailed Collins requesting her assistance with developing his SES Year-End Executive Accomplishment Summary Reports for rating and review. This followed a conversation Mr. Gaston had with his colleague Mr. Paden where Mr. Paden detailed how he had been able to receive awards, including the Administrator's highest performance award issued, two- years running. According to Mr. Paden, he sent his summary of accomplishments to Collins and she would formulate his Summary Report. When Thomas attempted the same in light of this advice, Collins ignored him, and ultimately declined to assist him. Her reasons supporting this was that she might have assisted an employee, but never prepared a Summary Report for her direct reports. This too constitutes another dispute of a material fact as to whether Collins engaged in discriminatory practices.

- On **February 12, 2016,** Collins disregarded and overturned Plaintiff's decision to not concur with DA Tim Cotter's decision to allow Mark Milligan a 120-day detail at the National Training Center ("NTC"). The day prior, Mr. Milligan filed an Administrative Grievance against Plaintiff.

15

Rather than support Plaintiff's decision, she conducted an arbitrary grievance procedure that was neither complicit with FMCSA Administrative Grievance Procedures, nor the EEO Complaint process. Although Plaintiff developed an alternative development assignment, his efforts were ignored. Moreover, despite Plaintiff's rationale of prioritizing agency needs, resource shortages, and under performance by the PA Division and S/I Milligan, none of this was considered by Collins. Instead, she chastised Thomas for his decision, noting he should have known this was something she wanted to happen. Apparently, because Collins confirmed such with Plaintiff's direct report, she expected her more senior RFA Thomas to be informed by Cotter, although she made no effort to ensure it occurred Finally, Collins held the entire grievance process against Thomas, via the "impartial" Mr. Quade. At the time, Mr. Quade's division was over the NTC, creating an obvious conflict, but Collins still made him the deciding official in this grievance.

- On **August 3, 2017**, Collins harassed Plaintiff regarding travel arrangements to an out of state meeting as he chose to fly direct from his authorized telework location instead of flying back to the DC area, then driving out of town. Collins has since defended this action under the pretext of trying to make sure government resources were most efficiently used. However, this is disputed by the statements of Talbott, noting how Collins regularly allowed several of her white direct reports to conduct themselves with travel and accommodations that were not as scrutinized. *See* Pl. Exh. 2.

- On **June 4, 2018**, Collins sent an intimidating email to Plaintiff questioning his decision-making and directing him to lower the assigned proposed year-end evaluation ratings for his direct reports. Similarly situated, white RFAs did not receive this request. Further, as scores were used as basis for allotting bonuses to white employees, this stifled the opportunities for career advancement for employees solely by the nature of being a direct report for Thomas.

- On **August 2, 2018**, Collins made one her regular inappropriate, negative, and belittling comments to Plaintiff. During a team call, she showed her racial preference toward two white RFAs with less experience than Plaintiff. She told Thomas that he "should be more like your colleagues Darrell Rubin and Darrin Jones", who collectively had less than half of his experience as a SES- with one preferred employee having less than 1 year of experience at the time.

- On **October 10, 2018**, while Thomas was away on work travel approved by Collins, she scheduled a 30 min call to discuss his summary SES performance accomplishments. Due to work cell phone issues, Plaintiff retrieved his personal phone to call Collins. As he was 20 minutes late, she started the call, "You like blowing me off." She then alleged that Plaintiff was not prepared for the call and demanded they reschedule. As such, Plaintiff was forced to conduct this call to go over his performance rating and evaluation while at the airport terminal. During this call, Collins

commented that her big issue with me was communications, and that I do not seem to want to call her for things like my colleagues do. Plaintiff was then forced to assuage the guilt of Collins, unable to acknowledge the discrimination and harassment that prevented such communication. As the call finished, Thomas tried nevertheless to communicate his hurt. He told Collins how he grew up during a segregated South and saw and experienced racial discrimination. He continued, "several of the things you do, say and how you act and treat me as compared to others, closely resemble what I experienced and dealt with during those times." Collins sidestepped his candor. She replied, effectively stating that she grew up in Massachusetts with black friends, and therefore can communicate with anyone.

- On **Wednesday, November 14, 2018**, Thomas gave welcoming remarks to the USVI officials who had traveled to Washington, D.C., having obtained prior approval from Collins to do so. As he returned to the meeting, and although he had already obtained her approval to leave the meeting, Collins confronted him in the hallway, and began to publicly confront and admonish him about exiting the meeting. She then began badgering him saying he was purposely missing her weekly field leadership calls on Thursdays. Collins demanded, on the spot, an apology from Thomas. He apologized. When he requested the same from Collins for how she treated him, she refused to respond.

- At the end of FY 2013 and FY 2014, Collins unsuccessfully attempted to assign Plaintiff a "poor" SES Performance Evaluation Rating. In both instances, Plaintiff sought outside counsel and successfully appealed those ratings to a higher level or review.

- Multiple time from 2013-2017- Collins denied Plaintiff the opportunity to obtain the same career advancement of his white counterparts. When he sought to continue taking courses towards his Ph.D., Collins gave him conditional permission if he could find the doctorate course offering(s) for free. Likewise, when Plaintiff sought to attend executive leadership training at Harvard Kennedy School, it was denied in 2013 and again in 2015. During this time, Collins and several white males, Mr. Paden, Mr. Terry Wolf, and Mr. Darrell Ruban, all attended this same executive leadership training for which Plaintiff was denied the opportunity. Only after speaking with the FMCSA's newly appointed Deputy Administrator Ms. Cathy Gautreaux in November 2017, was Plaintiff given support to attend an Executive Development Training Course at Duke University in December 2017.

It has become increasingly clear, that Plaintiff's and Defendant's perception of almost every episode of note is starkly different in a way where truth cannot pour from both ends. It follows, that these genuine disputes of material fact warrant denial of summary judgment.

17

**LEGAL STANDARD OF REVIEW**

A.  MOTION FOR SUMMARY JUDGMENT – FRCP 56

     Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When considering a motion for summary judgment, the principal issues that arise are whether a factual dispute exists, whether the dispute is material to the outcome of the case, and whether the dispute is genuine. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." 477 U.S. at 249. In the context of discrimination cases, summary judgment should be approached with special caution because of the difficulty of proving discriminatory intent and disparate treatment. *Morgan v. Federal Home Loan MortgageCorp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001).

     In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec.Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); see also *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Under this analysis, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Id.* at 255; *See also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C. Cir. 1989). Accordingly, the moving party, and in this case the Defendant, bears the burden of showing that there is no genuine dispute as to any material fact. *American International Group, Inc. v. London American International Corp.*, 664 F. 2d 348, 351 (2d Cir. 1981).

In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. A movant for summary judgment must support the motion with evidence including "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice" must or may "be taken." The court must only "render the judgment soughtforthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine issue as to any material fact." That is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law. *See Anderson*, *Id*. at 248-49.

Untimely exhaustion of administrative remedies is an affirmative defense, and the defendant bears the burden of pleading and proving it. *See Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985). If the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense. *See Bayer v. UnitedStates Dept. of the Treasury*, 956 F.2d 330, 332 (D.C. Cir. 1992).

**ARGUMENT**

Defendant's Motion should be denied in its entirety because it is predicated on a serious misunderstanding of the law regarding exhaustion of administrative remedies and adverse employment actions that establish a pattern of discrimination, retaliation and a hostile working environment.In addition, summary judgment is inappropriate at this stage of the litigation because material issues of disputed fact exist as demonstrated by the separate Plaintiff's Statement of Genuine Issues,the submitted sworn testimony, documents containing Defendant's admissions, and other evidence submitted by Plaintiff in support of this opposition.  Plaintiff has demonstrated that there are several genuine disputes regarding material facts. Finally, the reasons provided for the Defendant's actions are merely pretextual and do not establish a legitimate, non-

discriminatoryreason for its adverse actions taken against Plaintiff. As a result, Defendant's

Motion must be denied.

## A. DEFENDANT'S EXHAUSTION ARGUMENTS ARE CONTRARY TO ESTABLISED LAW

By any measure, Plaintiff has administratively exhausted the allegations in his

Complaint.  Defendant incorrectly tries to cabin Plaintiff's claims of discrimination and

retaliation into more than a dozen "events" and argues in effect that each "event" must be treated

as a standalone legal claim. This view is contrary to well- established law under Title VII.

Plaintiff correctly asserts prior events that he experienced while employed by Defendant to

evince a pattern of discrimination based on race, hostile working environment and retaliation.

Defendant's Motion largely argues that Plaintiff failed to timely file a Complaint

regarding 13 of 15 "discrete acts" thereby making them time-barred from this Court's

adjudication. Def. Mot. at 24. For such, Defendant relies on Plaintiff first contacting an EEO

counselor on October 26, 2018, thereby limiting Plaintiff's claims to only events occurring

within 45 days of that date, or after September 11 2018. However, courts have continuously

held that "the exhaustion of administrative remedies… is less stringent for hostile work

environment claims than discrete claims of discrimination or retaliation." *See Na'Im v. Rice*,

577 F.Supp.2d 361, 372 (D.D.C. 2008); *Jones v. Bush*, 160 F.Supp.3d 325, 352 (D.D.C. 2016).

Similarly, Defendant's attempt to reduce Plaintiff's fifteen examples over six years, of

constant, unwelcome harassment, bullying and disparate treatment, into mere "discrete acts"

all because the Complaint lacks the magical words "hostile work environment" is simply

disingenuous. *See Whorton v. Washington Metropolitan Area Transit Authority*, 924.

F.Supp.2d 334, 348 (D.D.C. 2013) (quoting *Maryland v. Sodexho, Inc.*, 474 F.Supp.2d 160,

162 (D.D.C. 2007) ("The law does not hold an employee to the use of magic words to make

out a proper discrimination charge.")).

According to defendant, it did not investigate a hostile work environment claim because one was not put forth. Defendant blindly ignores notice of such culture or environment, as illustrated by the facts set forth in Gautreaux's memo in April 2018 detailing the intimate details of working under Collins; and as shown the multiple successful lawsuits filed by Kelly and McWay alleging discrimination and retaliation.

 In sum, Defendant's attempt to persuade this Court that Plaintiff is precluded from raising these "events" in pleadings his claims is based on a reading of the events as distinct "discrete acts"[4] that are not related to the complained of discrimination or retaliation.  However, these arguments are contrary to law and reality and are therefore without merit.

1. *The Claims Raised by Plaintiff in the Complaint Are Reasonably Related to the Claims Presented in His Administrative Charges.*

Contrary to the Defendant's assertions that several "events" are time-barred for the failure to raise them at the administrative level, Plaintiff is not precluded from alleging a pattern of discrimination based upon these occurrences before this Court because his claims are reasonably related to the claims presented in his administrative charges.

The Supreme Court has held that hostile work environment claims are different from discrete acts as "[t]heir very nature involves repeated conduct" and the repeated conduct is "evidence that management knew or should have known of its existence." *Nat'l R.R. Passenger Corp. v. Morgan* (Morgan), 536 U.S. 101, 115- 117 (2002) (finding that an employee's "hostile

---

[4] Even if the instances of this present matter are deemed to be discrete acts, the date referenced by Defendant of October 26, 2018, when Plaintiff filed his EEO complaint, is inapplicable. Def. Motion at 31. This is not the date upon which the agency received actual notice as Deputy Administrator Gautreaux advised Martinez of such issues via her memorandum from April 2018. In fact, as Gautreaux's Memo speak of her observations in November 2017, if this Court finds Plaintiff's other arguments unpersuasive claims should still be considered administratively exhausted so long as they occurred after October 16, 2017.

work environment claim is comprised of a series of separate acts that collectively constitute an unlawful employment practice"); *see also President v. Vance*, 627 F.2d 353, 361 (D.C. Cir. 1980) ("the relevant inquiry is not whether the complainant has filed a detailed statement spelling out precisely her objections but whether the actions she did take were 'adequate to put the [agency] on notice.'") Likewise, because their very nature involves repeated conduct, the "unlawful employment practice" cannot be said to occur on any particular day. *Morgan*, 536 U.S. at 115; Rather, it occurs over a series of days or perhaps years. In direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20 (1993). In other words, when alleging a hostile work environment claim, it will not be time barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 128.

Defendant's attempt to bar Plaintiff's claims fail as their acts constitute the same unlawful employment practice. Here, Plaintiff filed his EEO complaint on October 26, 2018. In this complaint he alleges all fifteen instances which make the basis of this present matter. *See Langley v. Napolitano*, 677 F. Supp. 2d 261, 268 (D.D.C. Jan. 6, 2010) (denying a federal agency's motion for summary judgment "where the Plaintiff complained in her EEO Complaint of the very same conduct that she now asserts forms the basis of her hostile work environment claim in this lawsuit."). The Court in *Langley* continued,

> [a]ccordingly, even if the Court were to find… that Plaintiff had not specifically articulated a hostile work environment claim in her EEO Complaint, the Court would nonetheless conclude on this basis that Plaintiff's hostile work environment claim is "'like or reasonably related to the allegations'" in her EEO Complaint.

*Id*.

Here, these instances all include the same bad actor, Collins, constantly inflicting harm, embarrassment, humiliation and degradation upon Plaintiff for over six years. The only difference in these claims is the manner or tool Collins used to torment Plaintiff. A reading of Thomas's EEO

complaint shows how connected these instances are to the same unlawful employment practice. It summarizes:

> From 2013 to present, Mr. Thomas has been subjected to constant unwelcome harassment, bullying and disparate treatment by Anne Collins, Associate Administrator and Mr. Thomas's direct supervisor. Examples of harassment endured include, but are not limited to, the undermining of his authority, public embarrassment and humiliation, denial of transfer requests, and unfairly comparing him to fellow colleagues.

Plaintiff made clear that he was subjected to "unlawful and unwanted patterns … of workplace harassment, undermining, intimidation, bullying and disparate treatment by Anne Collins." He additionally recalled how due to his participation in the prior EEO hearing of Kelly against the agency and Miller, he became the primary target of Collins's angst and retaliation. Thomas Decl. ¶ 4.

He similarly identifies multiple instances of how he was subject to disparate treatment in comparison to similarly situated white employees. Most consistently, Collins showed stark preferential treatment, between Thomas and primarily, Thomas Decl. ¶¶ 10, 11, 15, 36. On numerous occasions, Plaintiff received inferior condition in every way imaginable, from being provided fewer resources, less support and receiving more scrutiny for travel and methods used, to a delay in resources being deployed, and a targeted denial of professional advancement opportunities. Mr. Paden's interactions with Collins reflect that of an entirely different dynamic than that experienced by Plaintiff.

While Defendant may argue that these events lack temporal likeness, they more than account for with common patterns of harassment, reprisal, racially charged remarks, and outbursts against employees who dared to defy Collins. As such, it is reasonable to conclude that these 15 events allegations and interactions of this present matter, grew out of the same unlawful employment practice as those alleged in his EEO complaint. Therefore, Plaintiff has established that the earlier adverse actions he suffered were reasonably related to his charge of discrimination. In essence, Plaintiff has evinced a pattern of discrimination and retaliation

beginning in 2013 that provides informative context for the hostile working environment that he

endured as an employee of Defendant. *See generally Whorton*, 924 F.Supp.2d at 349 ("Any

investigation resulting from these communications which repeatedly refer to a number of

allegedly discriminatory acts, "continuing action," a continuous pattern of discrimination and

harassment … retaliation with regard to… terms/conditions, and harassment…and hostile

treatment … culminating in constructive discharge, would reasonably encompass a hostile work

environment claim.") For these reasons, Plaintiff's claims should be fully adjudicated at trial.

## B.  PLAINTIFF HAS ESTABLISHED TRIABLE CLAIMS OF RACIAL DISCRIMINATION

Defendant argues, after meritlessly attempting to limit the events of Plaintiff's Complaint to

two discrete agency acts, that Plaintiff has not established he was subjected to a materially adverse

employment action and that Defendant has proffered legitimate, non-discriminatory reasons for its

discrimination of Thomas. Def. Motion at 32, 41. As depicted below, Defendant's arguments are

flawed and must fail.

It is well settled that when alleging a claim for racial discrimination under Title VII, a

plaintiff may follow the McDonnell Douglas three-part burden-shifting analysis. *Na'Im*, 577

F.Supp.2d at 373-74. Under this framework, plaintiff carries the initial burden of proving a prima

facie case of discrimination. *Id*. If the plaintiff succeeds in doing so, the burden shifts to the

employer to articulate some legitimate nondiscriminatory reason for the employee's rejection. *Id*.

If the employer is too successful, plaintiff must demonstrate that the legitimate reasons offered

were a pretext for discrimination and not their true reasons. *Id*. (citing *Tex. Dep't of Cnty. Affairs v.

Burdine*, 450 U.S. 248, 252-53 (1981)).

To establish a prima facie case for race discrimination under Title VII, plaintiff must show

he is a member of a protected class, he suffered an adverse employment action, and the unfavorable

action gives rise to an inference of discrimination. *Id*. In Plaintiff's Complaint to this Court, he

asserts that his is a member of a protected class (African American); he was subjected to unwelcome

behavior that was based on his race; and the harassment he experienced affected a term and condition

of his employment. Pl. Compl. ¶¶ 44-48. The pleading of his claim, coupled with the evidence

submitted in support of his assertions, suffice to establish a claim or race discrimination.

Moreover, with respect to Plaintiff's claims of hostile work environment and retaliation,

Plaintiff pleads facts that directly relate to the prior protected activity of 2013 that continued

throughout his tenure at DOT/ FMCSA. Courts have long allowed filed Title VII claims so long

as they are sufficiently "like or related" to those specified in the administrative charge. *Mackin*

*et. al.,*. 478 F.2d at 988; *see also Klein*, 869 F. Supp. at 10 ("when a plaintiff alleges new claims

from the same basis of discrimination, they can be litigated, notwithstanding the failure to raise

them at the administrative level if they could 'reasonably be expected to grow out of the charge

of discrimination'"). *Armstrong*, 172 F. Supp.2d at 20. Here, because his claims of hostile work

environment and retaliation relate back to the original protected activity, Plaintiff has, in effect,

alleged discrimination based on his race.

### 1.  *Adverse Actions as Required by Title VII*

The record does not lack of instances of adverse actions that have been suffered by Plaintiff

from the unwanted harassment and bullying to the discrimination and hostile working environment

he endured subsequent to engaging in a protected activity. Plaintiff has well demonstrated that he

does meet the requirements of "adverse action" within the meaning of Title VII. The anti-retaliation

provision of Title VII states as follows:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees...because he has opposed any practice made an unlawful
> employment practice, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing under this
> subchapter.

42 U.S.C. § 2000e–3(a). In order to establish a case of retaliation, a Plaintiff must demonstrate (1)

that he engaged in protected activity and that (2) as a consequence (3) his employer took a materially adverse action against him. *See e.g., Weber v. Battista*, 494 F.3d 179,183–84, 2007 WL 2033254, at *4 (D.C. Cir. 2007); *Na'Im*, 577 F.Supp.2d at 379; *Vance v. Chao*, 496 F.Supp.2d 182, 185 (D.D.C. 2007). Unlike for discrimination claims, a plaintiff need not establish an "ultimate employment decision" to prove retaliation. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371,375–76 (4th Cir. 2004). Plaintiff does not bear a heavy burden, as he must only "establish facts adequate to permit an inference of retaliatory motive." *Na'Im*, 577 F.Supp.2d at 379. An "adverse action" in a Title VII retaliation context is an action that produces an injury or harm such that it "might well" dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

   Materiality of an adverse action is an objective determination, meaning that "[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities will not suffice." *Reinhardt v. Albuquerque Pub. Sch. Bd. Of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010).  Accordingly, application of the Title VII retaliation provision is not limited to an employer's actions that affect terms, conditions or statusof employment. The scope of the retaliation provision is much broader. *See Burlington*, 548 U.S. at 53.

### 2.   *Causation as required by Title VII*

   Because causation in a Title VII retaliation case can be difficult to prove, in the absence of direct evidence, the plaintiff may instead show that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter. *Na'Im*, 577 F.Supp.2d at 380; *Vance*, 496 F.Supp.2d at186; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985);

*Brown v. Snow*, 407 F.Supp.2d 61,66 (D.D.C. 2005); *see also Swierkiewicz*, 534 U.S. at 511. In this case, Collins has disputed whether she had knowledge of Plaintiff's protected activity that occurred in 2012. While possible, this seems implausible.

As discussed *supra*, Collins was first hired into FMCSA in 2010 as an AA. Miller was her direct report in 2010 and FA for the ESC since 2006. Miller was preceding Miller's efforts to have Kelly removed from his DA position. Kelly filed his suit against Miller and the agency in 2006. As part of this suit, Plaintiff was relied upon to provide crucial testimony in support of Kelly, which he provided on July 16, 2012, just one month after Administrator Ferro hired him for the RFA role in the ESC over Miller. In other words, according to Defendant – when she arrived in 2010, her direct report Miller, never made any mention regarding the EEO case he and the agency was presently defending against for the past four years. Miller also never mentioned anything in the two years that followed of them working together. And when Thomas, an African American, earned the position that Miller, at that time defending against claims of racial discrimination, was up for, Miller again told her nothing of Thomas's participation. Again, possible but unplausible.

This is before any of Collins's own conduct is examined. During Kelly's selection process and immediately thereafter, Collins revealed her hand. In Kelly's statement he details a conversation he had with Director of Civil Rights Kennie May. *See* Pl. Exh. 4. May brought to his attention that Collins had asked May about the possible consequences if she denied Kelly for this promotion. *Id*. Specifically, she asked whether May thought Kelly would "file an EEO complaint against me" for such discrimination and retaliation. *Id*. May advised, "[a]s sure as you are standing in front of me, the agency will be writing him another check" referencing Kelly's recent settlement against Miller and the agency. Kelly heard variations of Collins's conduct from multiple colleagues as his complaint was not a well-kept secret. The only secret

less well-kept was that Collins was apparently trying to deny his promotion on multiple occasions until the agency, in fear of further litigation demanded she stand down.

Still, Collins further exposed her allegiance to Miller. Prior to Thomas's selection of Kelly for the FA position, Collins used different tactics to communicate that she did not want him to get this position, regardless of merits. Starting off subtly, Collins tried to delay the position's posting so that more candidates (not named Taft Kelly) might apply. Upon realizing this did not work, and that Thomas was recommending Kelly, she began to harass Thomas, confronting him to try and change his mind. On one such encounter she proudly stated that she had it from a good source that Kelly is not a good candidate. When Thomas asked her basis, she leaked out Bob Miller as her "good source." Another encounter led to Collins's spewing at Plaintiff, that she would *let* him hire Kelly over her dead body.

Finally, after Kelly's selection, she summoned Kelly and Thomas to her office. Yet, at this meeting with Kelly and Thomas, she impressed upon them the importance, and directed them to, go meet with Miller to iron out any differences. Apparently, Collins wanted those who had been discriminated against to approach those responsible for the discrimination to extend an olive branch. It remains unclear why Collins felt the need to insert herself here, or in this unorthodox manner, into a relationship which she alleges to have no real knowledge of. Before, when asked about Miller and Kelly's relationship during her deposition Collins said, "I knew that there was some history, but I didn't know what it was." Shortly thereafter, Thomas found himself challenging his annual evaluations from Collins. Whereas he had received multiple awards and outstanding reviews, apparently at the same time he came under Collins's purview, his skills as an employee started to diminish, accounting for his less than stellar reviews.

 Perhaps most indicative of whether Collins knew of Plaintiff's and Kelly's protected activity, is how Collins responded in similar circumstances. Recapping the pattern of Kelly:

African American employee working in hostile work environment, employee becomes target of discrimination; employee receives support in his lawsuit from Thomas, his superior; Thomas tries to select employee for promotion; Collins retaliates against employee blocking selection and Thomas receiving harassment, bullying, belittling, and undermining, to wit: providing lesser reviews, less resources than white counterparts, being called "uppity" and a denial of leave and career advancement.

In McWay's case, he too was engaged in protected activity, this time against the Agency's Former Chief Safety Officer Jack Van Steenburg in 2010. From such Collins told him, he'd never be promoted for what he "done," in this instance that being standing up for himself against discrimination. In 2015, an employee threatened to lynch McWay for which Collins waived off any discipline. Thomas, once again, came to the aid of his employee, but he too was ignored. Then, in 2018, McWay was selected for the SPM position in the ESC. Although he immediately accepted, he was contacted shortly after notifying him that Collins had rescinded the offer, effectually blocking his selection. The pattern holds: African American employee working in hostile work environment, employee becomes target of discrimination; employee receives support from Thomas, his superior; Thomas tries to select employee for promotion; Collins retaliates against employee blocking selection and Thomas receiving harassment, bullying, belittling and undermining, to wit: ridiculing and yelling at Thomas in front of his direct reports and persons outside the agency, denying career advancement, providing higher scrutiny of his work, offering less assistance, frequently berating Thomas only to blame him for her yelling,  eventually leading to his constructive discharge.

In light of the evidence presented, the Court should find that Plaintiff has demonstrated that Collins had knowledge of Plaintiff's protected activity and began to retaliate against him and others shortly thereafter. Plaintiff has therefore provided ample evidence of the causal

connection required for his retaliation claim. Further, resolving in favor of the non-moving

party, the question of whether Collins knew of Plaintiff's protected activity is a material fact in

dispute, which makes summary judgment inappropriate.

### 3. Adverse Actions Suffered by Plaintiff

#### a. Adverse Action No. 1.

On **Wednesday, November 14, 2018**, Thomas gave welcoming remarks to the USVI

officials who had traveled to Washington, D.C., having obtained prior approval from Collins to

do so. As he returned to the meeting, and although he had already obtained her approval to

leave the meeting, Collins confronted him in the hallway, and began to publicly confront and

admonish him about exiting the meeting. She then began badgering him saying he was

purposely missing her weekly field leadership calls on Thursdays. Collins demanded, on the

spot, an apology from Thomas. He apologized. When he requested the same from Collins for

how she treated him, she refused to respond. This public incident made Plaintiff feel humiliated,

embarrassed, and belittled as Collins chose to air her grievances in a public forum, before she

demeaned him in front of his peers and direct reports, stifling his reputation of leadership. It

also confirmed that Collins inappropriate conduct, actions and provocation was not going to

stop even after his complaint was filed. Defendant denies having this meeting in a public setting

and claims a different tone was used. She further states that prior approval had not been given.

In considering a motion for summary judgment, the court must view the evidence "in the

light most favorable to the nonmoving party." *Anderson*, 477 U.S. at 225. Thus, this starkly

unresolved genuine issue of material fact makes summary judgment in favor of the Agency,

inappropriate. Further, in the context of retaliation, this action rises to the level of an "adverse

action" because it produced an injury or harm that might well dissuade a reasonable employee from

making or supporting a charge of discrimination. In the case at bar, Plaintiff had just filed an EEO

complaint weeks prior, and Collins's conduct made it clear that the bullying, demeaning treatment

he was receiving was not going to change. Added to this demeaning behavior occurred in a public

setting, naturally, it would dissuade Plaintiff from raising additional complaints regarding the Agency's conduct due to this inevitability, thereby squarely placing this shift adjustment into an adverse action.

### b. Adverse Action No. 2.

On **June 25, 2018**, a merit promotion certificate of eligibility was issued for candidates to be interviewed and one selected for the position of SPM for ESC. On July 26, 2018, Plaintiff as the selecting official based on a unanimous panel selection chose McWay from the DC Division Office for the promotion. McWay was offered and accepted the position promotion. Friday, August 3, 2018.Collins advised Plaintiff by telephone of her decision to non-concur with offer and directed FMCSA Human Resources to rescind the offer to McWay. Collins had no authority to do, as Plaintiff was by statute, the selection officer. As one of his responsibilities as the RFA, when Collins prevented him from exercising such, she reduced the scope of his position as well as humiliated him in front of his direct reports, thereby constituting an adverse action.

### c. Adverse Action No. 3

At the end of FY 2013 and FY 2014, Collins unsuccessfully attempted to assign Plaintiff a "poor" SES Performance Evaluation Rating. In both instances, Plaintiff sought outside counsel and successfully appealed those ratings to a higher level or review. These repeated attempts of humiliating and discrediting Plaintiff, alongside Collins's simultaneous attempts to provide assistance and resources to white RFAs to promote them as the best candidates for career advancement, made for striking comparisons that have done irreparable damage to Thomas's reputation, thereby constituting an adverse action.

### C.   GENUINE ISSUES OF MATERIAL FACT EXIST

Defendant's Motion does not establish that the Plaintiff's claims can be adjudicated without trial because there remain to be solved many genuine issues that are essential to the

merits of Plaintiff's claims. From the commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. There is a genuine issue of material fact if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. Here, the Defendant does not come close to meeting its requisite burden for its Motion to be granted.

In its Statement of Material Facts ("SOMF"), the Defendant alludes to several facts that are, in fact, vehemently contested by Plaintiff. *See* Def. SOMF ¶ 3, 6, 18, 20, 25, 28, 29, 30-31, 35, 38, 39, 42 and 47-49, 52, 55, 58-60.  By way of example, the aforementioned material issues in dispute directly go to this Court's inquiry of whether Plaintiff was subjected to retaliatory and discriminatory actions by the Agency and a hostile working environment:

- Whether Collins had a factual basis for the providing Plaintiff poor SES Performance Evaluation Reviews in FY- 2013 and FY-2014 that were subsequently appealed for a higher-level review.
- Whether Collins provided the same level of input and scrutiny to the selection decisions of white RFAs as she did to Plaintiff.
- Whether Collins had any factual basis for interfering in Plaintiff's selection of Kelly and McWay.
- Whether Collins was aware that Plaintiff had been a witness in Kelly's EEO case alleging discrimination against the agency and Bob Miller.
- Whether DOT routinely granted hardship transfers, under what conditions, and whether Collins was aware of such when she denied Plaintiff's request for a hardship lateral transfer.
- Whether Collins approved a hardship lateral transfer for Sterlin Williams.
- Whether Collins completed or directly assisted in the annual self-evaluations of her direct reports.
- Whether Collins denied Plaintiff the opportunity to attend executive training courses offered by Harvard University, before ultimately approving such courses for herself and several other white employees.
- Whether Collins was actively involved or influenced the decision of William Quade to overrule Plaintiff's decision approving a 120-day detail for Safety Investigator Mark Milligan.

- Whether Collins was willfully blind to the events surrounding Sanders lynching remark to McWay and whether such blindness factored in her subsequent decisions to promote Sanders but rescind McWay's selection offer.

- Whether Collins regularly questioned the travel plans of all her employees with a high level of scrutiny as an act of due diligence.

- Whether Collins was aware of a memorandum dated April 16, 2018, from Plaintiff to Deputy Administrator Cathy Gautreaux before present litigation began.

- Whether Collins was involved in the re-opening of any investigations against McWay and whether her questioning of McWay's suitability was for any reasons outside of that investigation.

- Whether Collins had received advice from Agency counsel and Administrator Raymond P. Martinez prior to taking action to rescind McWay's offer.

- Whether Collins had prior notification of Plaintiff's intent to leave a November 14, 2018, meeting early.

D.  PLAINTIFF ENDURED A RETALIATORY HOSTILE WORK ENVIRONMENT ASA RESULT OF HIS PRIOR EEO ACTIVITY.

Plaintiff was constantly subjected to a hostile work environment as a result of discrimination and his prior EEO activity, that is, participating in the successful discrimination lawsuit for Kelly against the agency. A hostile work environment exists in violation of Title VII where the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris*, 510 U.S. at 20.

To prevail on a hostile work environment claim, the plaintiff must show both 1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of his employment, and 2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment. *Briones v. Runyon*, 101 F. 3d 287, 291 (2d Cir. 1996).

Here, each of the adverse actions that Plaintiff suffered following his testimony in Kelly's case was permeated with discriminatory intimidation. For instance, when compared to similarly

33

situated white employees, denial of career advancement opportunities, denial of remote work and a hardship transfer to care for his ailing wife, being called "uppity", receiving unfair negative evaluations, have his travel arrangements and movements policed and unfairly scrutinized, having his authority and job responsibilities reduced to wit: his abilities as Selection Officer for his direct reports, being forced to condone verbal acts of racial violence against his employees without being allowed to take appropriate action, being berated and verbally abused in front of his direct reports, and being retaliated for engaging in protected activity all derived from the same animus. Plaintiff voiced his concerns, discontentment and fears with the way he and his direct reports were treated and Defendant either ignored, invalidated or barely attempted to adequately address the issue. As such, Plaintiff has demonstrated that he experienced a hostile work environment while employed by Defendant.

**CONCLUSION**

As discussed herein, there remain genuine issues of material fact precluding entry of summary judgment. For these reasons, Plaintiff respectfully requests that Defendant's Motion be denied.

Dated: October 29, 2021                                      Respectfully Submitted,

                                                             ___/s/  Raymond C. Fay
                                                             Raymond C. Fay
                                                             D.C. Bar No. 188649
                                                             Fay Law Group PLLC
                                                             1250 Connecticut Avenue, NW
                                                             Suite 700
                                                             Washington,  D.C.  20036
                                                             rfay@faylawdc.com
                                                             Tel: 202-263-4604
                                                             Fax: 202-261-3508
                                                             Cell: 202-744-3565

                                                             ___/s/  Dionna Maria Lewis
                                                             Dionna Maria Lewis, Esq.
                                                             D.C. Bar No. 219016
                                                             District Legal Group, PLLC
                                                             700 Pennsylvania Ave SE, Suite 2098
                                                             Washington, D.C. 20003
                                                             Tel. (202) 486-3478
                                                             Dionna@DistrictLegalGroup.com

                                                             Attorneys for Plaintiff Curtis Thomas